**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SDI SOLUTIONS LLC, *et al.*, | Case No. 16-10627 (___) |
| Debtors.[1] | (Joint Administration Requested) |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND
FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507,
BANKRUPTCY RULES 2002, 4001, 6004, AND 9014, AND LOCAL RULE 4001-2
(I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL,
(III) GRANTING LIENS AND PROVIDING SUPER-PRIORITY
ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING
ADEQUATE PROTECTION, (V) SCHEDULING A FINAL
HEARING, AND (VI) GRANTING RELATED RELIEF**

SDI Solutions LLC and SDI Opco Holdings, LLC, as debtors and debtors in possession (collectively, the "Debtors"), by and through their proposed undersigned attorneys, hereby file this motion (the "Motion"), pursuant to sections 105(a), 361, 362, 363, 364, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim order on an expedited basis (the "Interim Order"), substantially in the form annexed hereto as Exhibit A, and a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders"),

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  SDI Solutions LLC (5389); and SDI Opco Holdings, LLC (8848).  The mailing address for the Debtors, solely for purposes of notices and communications, is 33 W. Monroe, Suite 400, Chicago, IL 60603.

(i) authorizing the Debtors to (a) enter into a postpetition financing arrangement on the terms set forth in the debtor in possession loan agreement attached hereto as <u>Exhibit B</u> (the "<u>Postpetition Loan Agreement</u>" and, together with such other documents and agreements entered into in connection therewith, the "<u>Postpetition Documents</u>"), and (b) use Cash Collateral (as defined below), (ii) granting liens and providing super-priority administrative expense status, (iii) granting adequate protection to the Debtors' prepetition secured lender, (iv) scheduling a final hearing pursuant to Bankruptcy Rule 4001, and (v) granting related relief (the "<u>Motion</u>").[2] In support of this Motion, the Debtors respectfully represent as follows:

<b><u>SUMMARY OF RELIEF REQUESTED</u></b>

1.      In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their liquidity needs and operate their businesses.  In addition, the Debtors require access to sufficient liquidity to fund these chapter 11 cases while working towards a successful sale transaction.  Postpetition financing, in addition to the use of cash collateral, is necessary in order for the Debtors to have access to sufficient liquidity to maintain ongoing day-to-day operations, ensure proper servicing of customers post-petition, and fund working capital needs.  Absent postpetition financing and the use of cash collateral, the Debtors will be forced to wind-down their operations due to a lack of funds.  It is therefore imperative that the Debtors have access to sufficient liquidity to avoid imminent irreparable harm and successfully consummate a sale transaction.

2.      Accordingly, by this Motion, the Debtors are seeking, *inter alia*:

(a)      authorization for the Debtors to obtain senior secured postpetition financing consisting of a revolving credit facility in a principal amount of up to $17,000,000 (the "<u>DIP Facility</u>") in accordance with the Postpetition Loan

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Interim Order or the Postpetition Loan Agreement.  To the extent that there is any conflict between this Motion and the Interim Order, the Interim Order shall control.

Agreement among SDI Solutions LLC, as borrower ("<u>SDI Solutions</u>" or the "<u>Borrower</u>"), SDI Opco Holdings, LLC, as guarantor ("<u>SDI Opco</u>" or the "<u>Guarantor</u>"), and PGV Solutions Midwest, LLC, as lender ("<u>PGV</u>" or the "<u>DIP Lender</u>");

(b)       authorization for the Debtors to obtain from the DIP Lender, during the interim period pending the Final Hearing (as defined below), revolving advances in amounts not to exceed a maximum outstanding principal amount of $1,700,000 (the "<u>Interim Amount</u>") in accordance with the Postpetition Loan Agreement and the Interim Order;

(c)       following a final hearing, authorization for the Debtors to use amounts under the DIP Facility to repay the Debtors' existing prepetition first lien secured indebtedness to PGV in the amount of approximately $13,500,000 (the "<u>Prepetition First Priority Obligations</u>"), with such amount constituting an obligation under the DIP Facility;

(d)       authorization for the Debtors to obtain from the DIP Lender upon entry of the Final Order total advances in an amount not to exceed a maximum outstanding principal amount of $17,000,000 (the "<u>Total Commitment</u>") in accordance with the Postpetition Loan Agreement, the Postpetition Documents and the Final Order, which Total Commitment includes the amount necessary to repay the Prepetition First Priority Obligations;

(e)       authorization for the Debtors to execute and deliver the Postpetition Loan Agreement and the Postpetition Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(f)       authorization for the Debtors to grant to the DIP Lender assurances for the full and timely payment of the Debtors' obligations under the DIP Facility by granting to the DIP Lender (i) pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim (a "<u>Superpriority Administrative Expense Claim</u>") having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 503(b) and 507(b) of the Bankruptcy Code, subject to the Carveout (as defined below), and (ii) pursuant to section 364(c)(2), (3) and (d) of the Bankruptcy Code, liens on, and security interests in, any and all of the DIP Collateral (as defined below), subject only to the Carveout and Permitted Liens (as defined in the Postpetition Loan Agreement);

(g)       authorization to use cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("<u>Cash Collateral</u>"), and authorization to use the proceeds of the DIP Facility in accordance with a certain budget in form and substance satisfactory to the DIP Lender, including to fund the costs associated with the Debtors' chapter 11 cases, to fund postpetition operating expenses of the Debtors during the chapter 11 cases, and to repay the Prepetition First Priority Obligations;

EAST\121930711.1                                           3

(h)     pursuant to sections 361 and 363 of the Bankruptcy Code, authorization to grant adequate protection to the Prepetition First Priority Lender (as defined below);

(i)     pursuant to section 362 of the Bankruptcy Code, modification of the automatic stay to the extent set forth in the Postpetition Loan Agreement and other Postpetition Documents;

(j)     pursuant to Bankruptcy Rule 4001, to schedule a preliminary hearing on this Motion and obtain authorization, from the entry of the Interim Order until the final hearing (the "Final Hearing"), to obtain credit under the terms contained in the Postpetition Loan Agreement and to utilize Cash Collateral to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates; and

(k)     pursuant to Bankruptcy Rule 4001, to schedule a Final Hearing on this Motion to consider entry of the Final Order authorizing the Debtors to borrow the balance of the DIP Facility on a final basis on the terms and conditions set forth in the Postpetition Loan Agreement.

## JURISDICTION

3.     This Court has jurisdiction over the Debtors, their estates, and this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Debtors consent, pursuant to Local Rule 9013-1(f), to the entry of a final judgment or order with respect to this Motion, if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

4.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The statutory predicates for the relief requested in this Motion are sections 105(a), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2.

## BACKGROUND

**A.     General Background.**

6.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating

their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

8.      SDI Solutions is a privately-held company headquartered in Chicago, Illinois with a financial institution services group located in Charleston, South Carolina.  SDI Solutions also has offices in Washington DC, Los Angeles, and Dallas.  SDI Solutions is in the security system and IT industry, and provides advanced security systems integration and managed services, ranging from strategic advisory services on system selection to long-term operational and technical support for clients' physical security/IT systems and infrastructure.

9.      SDI Solutions services over 700 customers nationwide, including large metro areas, state and local governments, and the numerous agencies that are regulated by them, such as airports, port authorities, utilities, financial institutions, and commercial enterprises.

10.      The company was founded in 1989 as an information services division of Environmental Systems Design, Inc., a premier building engineering firm.  In 1996, the division emerged from the parent as System Development.Integration, LLC ("System Development.Integration") with a focus on providing information technology solutions and advisory services to state and local governments and various entities governed by them.

11.      On June 18, 2013, System Development.Integration acquired I-Sys Corporation in order to expand its business into the private sector and, in August 2013, System Development.Integration acquired X7 Systems Integration, a Washington, D.C.-based integration company.  Effective January 1, 2015, System Development.Integration, Orion

Systems Group LLC (formerly d/b/a X7 Systems Integration), and SDI-isys, LLC merged to form SDI Solutions.

12.     SDI Solutions' expertise includes designing, implementing, and/or managing, among other things, security IT managed services, video surveillance systems, access control, advanced security systems monitoring, identity management, and enterprise systems integration. SDI has experience in addressing a variety of information technology security issues and applications, and its IT architects frequently work in conjunction with its security system experts in connection with security system design and integration.

13.     A more detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of David Sullivan in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference.

**B.     The Prepetition Secured Indebtedness.**

14.     SDI Solutions entered into an Amended and Restated Credit Agreement, dated as of June 17, 2013 (as amended, restated, reaffirmed, or supplemented from time to time, the "Prepetition First Priority Credit Agreement"), with Fifth Third Bank ("Fifth Third"), as lender. Pursuant to the Prepetition First Priority Credit Agreement, Fifth Third agreed to make a consolidated term loan to SDI Solutions in the aggregate amount of $9,000,000 (the "Term Loan") and extend a revolving line of credit facility to SDI Solutions in an amount not to exceed $8,000,000 (the "Revolving Commitment" and, together with the Term Loan, the "Prepetition Loans").

15.     Pursuant to the terms of the Prepetition First Priority Credit Agreement and related promissory notes, the non-default interest rate per annum on the outstanding balance of the Term Loan and the Revolving Commitment is equal to the prime rate plus 4.0%.  The default rate of interest on the Prepetition Loans is equal to the otherwise applicable non-default rate of interest plus 2.0%.  SDI Solutions' obligations under the Prepetition First Priority Credit Agreement are guaranteed by SDI Opco pursuant to a Guaranty, dated as of August 10, 2012 (as amended, restated, reaffirmed, or supplemented from time to time, the "Opco Guaranty").

16.     As security for the SDI Solutions' obligations under the Prepetition First Priority Credit Agreement and SDI Opco's obligations under the Opco Guaranty, each Debtor granted to Fifth Third a security interest in substantially all of each Debtor's assets (collectively, the "Collateral"), including, with respect to SDI Opco, a pledge and security interest in its membership interests in SDI Solutions.

17.     As discussed in more detail below, pursuant to a Loan Purchase and Assumption Agreement, dated as of February 11, 2016, by and between Fifth Third, as seller, and PGV Solutions Midwest, LLC ("PGV" and, in its capacity as secured creditor under the Prepetition First Priority Credit Agreement, the "Prepetition First Priority Lender"), as buyer, PGV purchased from Fifth Third all of Fifth Third's rights, titles, obligations, and interests in, to, and under the Prepetition First Priority Credit Agreement and related documents, agreements, and instruments.  Accordingly, the Debtors are currently obligated to PGV, as Prepetition First Priority Lender, in connection with the Prepetition First Priority Credit Agreement and Opco Guaranty, as applicable.

18.     As of the Petition Date, the aggregate amount outstanding in connection with the Term Loan was approximately $7,870,000 and the aggregate amount outstanding in connection with the Revolving Commitment was approximately $5,220,000.

19.     As of the Petition Date, the Debtors assert that (i) the liens in favor of the Prepetition First Priority Lender securing the Debtors' obligations under the Prepetition First Priority Credit Agreement and Opco Guaranty, as applicable, are valid, binding, perfected, enforceable first priority liens and are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (ii) the Debtors' obligations under the Prepetition First Priority Credit Agreement and Opco Guaranty, as applicable, constitute legal, valid and binding obligations, enforceable in accordance with the terms of such documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no offsets, defenses or counterclaims to any of the Debtors' obligations thereunder exist, and (iii) the Prepetition First Priority Lender's claims against the Debtors under and in connection with the Prepetition First Priority Credit Agreement, Opco Guaranty, and related documents constitute allowable secured claims.  The Prepetition First Priority Lender has a security interest in the Cash Collateral, including all amounts on deposit in the Debtors' deposit accounts.

**C.     Events Leading to the Chapter 11 Filings and Marketing Efforts.**

20.     As discussed in more detail in the First Day Declaration, the Debtors have experienced significant liquidity issues over the course of the past couple of years that have hindered their ability to make payments in the ordinary course of business.  Revenues have declined in part due to the expiration of certain key contracts, revised terms on certain renewed

contracts that are less favorable for the Debtors than prior contracts, and unexpected delays in 2015 in plans to rebuild the Debtors' sales force.

21.    In addition, the Debtors were unable to successfully integrate the Washington DC operations following the acquisition thereof in August 2013, and the Debtors experienced substantial losses on various large lump sum contracts that were assigned in connection with the acquisition.  As a result, the Debtors ultimately determined that the Washington DC operations were not viable in the long term, and such operations were discontinued effective in the second half of 2015.

22.    In addition to discontinuing the Washington DC operations, the Debtors sought to implement a number of other restructuring initiatives over the last year, including making appropriate adjustments in staffing, increasing negotiations with vendors and suppliers, and realigning their business and seeking out additional sources of funding and business opportunities, including through new customer contracts.  Also, in November 2015, the Debtors retained the services of Gulf Atlantic Capital Corporation ("Gulf Atlantic") to provide a Chief Restructuring Officer.[3]

23.    After careful consideration and consultation with their advisors, the Debtors ultimately determined that it was necessary to pursue a restructuring or financing transaction with one or more potential purchasers or other financing or strategic partners.  Beginning in November 2015, the Debtors, together with their advisors, identified and contacted more than thirty (30) potential strategic or financial partners regarding a potential financing (whether outside or in the context of a chapter 11 case), sale, or other restructuring transaction.

---

[3]    Gulf Atlantic no longer serves in the capacity of Chief Restructuring Officer.  Rather, effective as of February 2016, Gulf Atlantic serves only as financial advisor to the Debtors.

24.     Non-disclosure agreements were executed by thirteen (13) of such parties, and a confidential information memorandum prepared by the Debtors and their advisors containing information regarding, among other things, the Debtors' background and overview, financial performance and projections, and potential transaction scenarios, were distributed to each party executing a non-disclosure agreement.  In addition, the Debtors and their advisors provided these parties with access to a dataroom containing various documents and information regarding the Debtors, their businesses, and finances.

25.     The Debtors and their advisors were in regular contact with these entities and facilitated such entities' due diligence efforts; however, the Debtors were unable to reach an agreement with any party regarding a potential sale transaction or equity infusion. The Debtors, however, identified some parties, including PGV—which is an entity in which David Gupta, a former CEO of SDI Solutions, currently serves as President and CEO—that expressed interest in pursuing a transaction directly with Fifth Third to purchase and acquire Fifth Third's rights and interests under the Prepetition First Priority Credit Agreement and related documents.  PGV and others negotiated such a transaction directly with Fifth Third, and the Debtors and their advisors fully cooperated with and facilitated any due diligence requests.

26.     In February 2016, PGV entered into an agreement with Fifth Third pursuant to which PGV acquired all of Fifth Third's rights, titles, obligations, and interests under and in connection with the Prepetition First Priority Credit Agreement and related documents, agreements, and instruments.

27.     Upon consummation of PGV's transactions with Fifth Third and due to the Debtors' dire liquidity situation, the Debtors immediately commenced negotiations with PGV regarding funding needs and a potential sale or other restructuring transaction.  The parties

engaged in extensive, arm's length negotiations and ultimately were able to reach an agreement with regarding the terms of a stalking horse asset purchase agreement (the "Stalking Horse Agreement") involving a sale transaction pursuant to section 363 of the Bankruptcy Code pursuant to which PGV agreed to serve as the stalking horse purchaser (in such capacity, the "Stalking Horse Purchaser"), subject to higher or otherwise better offers.  The consideration being provided under the Stalking Horse Agreement consists of a credit bid under section 363(k) of the Bankruptcy Code with respect to a portion of the Stalking Horse Purchaser's secured claims against the Debtors and/or an assumption of such indebtedness, the assumption by the Stalking Horse Purchaser of certain liabilities set forth in the Stalking Horse Agreement, and the payment of all cure costs relating to executory contracts and unexpired leases to be assumed and assigned to the Stalking Horse Purchaser.

28.    Accordingly, the Debtors intend to file a motion at the outset of these cases seeking, among other things, (a) approval of certain auction and bidding procedures in connection with the sale of substantially all of the Debtors' assets, (b) approval of the Stalking Horse Agreement, and (c) to schedule an auction and sale approval hearing (the "Sale Motion").

**D.    The Debtor in Possession Financing.**

29.    In connection with the Debtors' overall restructuring efforts, the Debtors engaged in extensive negotiations with PGV regarding additional financing and, leading up to the Petition Date, PGV continued to provide funding to the Debtors under the Prepetition First Priority Credit Agreement to ensure continued operations and to bridge a smooth transition for the Debtors into chapter 11.  PGV also provided the Debtors with a term sheet for potential debtor in possession financing, which was negotiated among the parties and culminated in the Postpetition Loan Agreement.  Under the Postpetition Loan Agreement, PGV agreed to provide revolving

financing to the Debtors on the terms and conditions set forth therein and described below, and the Debtors believe that such postpetition financing is the best available under the circumstances and adequately addresses the Debtors' reasonably foreseeable working capital needs.

30.    Immediate access to postpetition financing and the use of Cash Collateral is necessary to enhance the Debtors' liquidity, provide necessary working capital during the pendency of these chapter 11 cases, and provide customers, employees, vendors, suppliers, and other key constituencies with confidence that the Debtors have sufficient resources available to maintain their operations in the ordinary course while working towards a sale transaction in accordance with the bidding procedures described in the Sale Motion.  The Debtors determined that the use of Cash Collateral alone would not provide sufficient liquidity for the Debtors to operate their businesses in an appropriate manner.  If the Debtors are unable to access this postpetition financing and use Cash Collateral, the Debtors' business operations, ability to effectively consummate a sale transaction, and ability to satisfy obligations to customers will be irreparably harmed.  For the foregoing reasons, the DIP Facility is in the best interest of the Debtors' estates, creditors, and other parties in interest.

## THE DIP FINANCING

31.    Consistent with Bankruptcy Rule 4001(c)(1) and this Court's requirements under Local Rule 4001-2(a)(ii), the principal terms of the DIP Facility and Interim Order are as follows:[4]

---

[4]    The terms and conditions of the DIP Facility set forth in this Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and should only be relied upon as such.  This summary is qualified in its entirety by the provisions of the Postpetition Loan Agreement and the Interim Order.  The Debtors reserve all rights in connection with the Interim Order.  Unless otherwise specified, terms used in this section have the same definitions as those in the Postpetition Loan Agreement.

| | |
|---|---|
| Borrower: | SDI Solutions LLC. |
| Guarantor: | SDI Opco Holdings, LLC. |
| DIP Lender: | PGV Solutions Midwest, LLC. |

DIP Facility:      Up to a $17,000,000 revolving credit facility (the "DIP Facility"), advances under which are subject to a budget acceptable to the DIP Lender (the "Budget"), the form of which is attached hereto as Exhibit C.[5]  Upon entry of an interim order approving the DIP Facility (in a form acceptable to Lender), Lender will advance up to $1,700,000 (the "Interim Amount") of the DIP Facility with the balance of the DIP Facility available upon entry of a final order approving the DIP Facility (in a form acceptable to the DIP Lender).

Use of Proceeds:      Under the DIP Facility, the Borrower shall incur advances and use the proceeds thereof solely as follows: (a) to the extent required to pay operating expenses and the costs and expenses of administering these chapter 11 cases subject to and in accordance with the Budget and (b) solely upon entry of a final order approving the DIP Facility, repay in full the Borrower's and the Guarantor's outstanding Prepetition First Priority Obligations to PGV, as Prepetition First Priority Lender, in the approximate amount of $13,500,000.

Termination Date:      The earliest to occur of: (i) the date on which the DIP Lender provides, via electronic or overnight delivery, written notice to counsel for the Debtors of the occurrence of an Event of Default; (ii) entry of an order converting any of the Debtors' chapter 11 cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the chapter 11 cases; (iii) if the Interim Order is modified at the Final Hearing in a manner unacceptable to the DIP Lender, in its sole discretion, the date of the commencement of the Final Hearing; (iv) the effective date of a chapter 11 plan in any of these chapter 11 cases; (v) closing with respect to an sale or other restructuring transaction involving a third party purchaser or restructuring counterparty; (vi) the date of the closing of a sale transaction with the Stalking Horse Purchaser; and (vii) on the first Business Day on or after sixty-five (65) days after the Petition Date.

---

[5]  The Debtors believe that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Budget.

| | |
|---|---|
| Carveout: | The liens, security interests, and Superpriority Administrative Expense Claims (as defined below) granted in favor of the DIP Lender in connection with the DIP Facility shall be subject to a Carveout.  The "Carveout" shall mean (a) all administrative expenses pursuant to 28 U.S.C. § 156(c) and 28 U.S.C. § 1930(a)(6) for fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee, respectively, without regard to the amounts set forth in the Budget; (b) all accrued and unpaid fees, disbursements, costs and expenses of professionals (collectively, the "Carveout Professionals") retained by the Debtors and any official committee of unsecured creditors appointed in these cases (the "Committee"), to the extent allowed by the Court by an interim or final order at any time, incurred prior to and up to the Termination Date, subject to and in accordance with the Budget (which Budget line items shall not be subject to any variance) and any order entered by the Court with respect to the interim payment of professional fees and expenses; and (c) all accrued and unpaid fees, disbursements, costs and expenses incurred by the Carveout Professionals after the Termination Date, to the extent allowed by the Court at any time, in an aggregate amount not to exceed $50,000. |
| Interest: | Interest shall accrue on the outstanding daily balance of the DIP Facility at a rate of 9.50% per annum. |
| Fees: | Unused facility fee due on the first Business Day of each calendar month in an amount equal to .50% per annum on the unused amount of the Loan Amount for each day during such period until the Termination Date. |
| | Facility fee of 2.0% of (i) the amount of the DIP Facility extended upon entry of the Interim Order (the "Interim Amount"), which facility fee will be added to the outstanding amount of the DIP Facility upon entry of the Interim Order, and (ii) the maximum principal amount of the DIP Facility minus the Interim Amount approved upon entry of the Final Order, which facility fee will be added to the outstanding amount of the DIP Facility upon entry of the Final Order. |
| | Exit fee of 3.0% of the amount of the DIP Facility outstanding on the Termination Date, payable upon the Termination Date. |

| | |
|---|---|
| <u>Security</u>: | The obligations in respect of the DIP Facility, including all principal, interest, expenses, fees and other amounts owing in respect thereof, shall be secured by a first priority perfected security interest in the equity of the Borrower and Guarantor and in all of Borrower's and Guarantor's assets, including all real and personal property, whether now owned or hereafter acquired, including causes of action and the proceeds thereof, and, subject to entry of a Final Order, any avoidance actions of the Borrower and/or Guarantor under sections 544, 545, 547 through 551 and 553(b) of the Bankruptcy Code (collectively, the "<u>DIP Collateral</u>"), subject only to Permitted Liens and the Carveout. |
| <u>Superpriority Administrative Expense Claim</u>: | The indebtedness of the Debtors under the DIP Facility shall constitute, in accordance with section 364(c) of the Bankruptcy Code, a superpriority administrative claim having priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, subject to the Carveout. |
| <u>Milestones</u>: | The Postpetition Loan Agreement contains the following milestones (the "<u>Milestones</u>") to be satisfied by the Debtors, |
| | (a)   Within one (1) Business Day of the Petition Date, file the Sale Motion to conduct the Sale, which Sale Motion shall be in form and substance acceptable to the DIP Lender, in its sole discretion; |
| | (b)   Within one (1) Business Day of the Petition Date, file a motion, in form and substance acceptable to Lender, in its sole discretion, to approve bidding procedures for the Sale in form and substance acceptable to the DIP Lender, in its sole discretion (the "<u>Bid Procedures</u>"); |
| | (c)   No later than on the first Business Day on or after seven (7) days after the Petition Date, file a motion, in form and substance acceptable to Lender, to retain a financial advisor acceptable to the DIP Lender for the purpose of conducting the Sale and performing other services; |
| | (d)   No later than on the first Business Day on or after seven (7) days after the Petition Date, cause such financial advisor to distribute necessary materials with respect to the Sale to potential purchasers of the Collateral and continue to distribute such materials, as appropriate, until the applicable deadline set forth in the Bid Procedures; |

(e)   No later than on the first Business Day on or after twenty-one (21) days after the Petition Date, obtain an order of the Bankruptcy Court, in form and substance acceptable to the DIP Lender, in its sole discretion, approving the Bid Procedures;

(f)   No later than on the first Business Day on or after twenty-five (25) days after the Petition Date, obtain an order of the Bankruptcy Court, in form and substance acceptable to the DIP Lender, in its sole discretion, approving the Debtors' employment of such financial advisor acceptable to the DIP Lender;

(g)   No later than on the first Business Day on or after thirty (30) days after the Petition Date, file schedules of assets and liabilities and statements of financial affairs for the Debtors;

(h)   No later than on the first Business Day on or after twenty-five (25) days after the Petition Date, obtain entry of the Final Order in form and substance acceptable to the DIP Lender, in its sole discretion;

(i)   No later than on the first Business Day on or after forty-seven (47) days after the Petition Date, commence and conclude the auction of substantially all of the Debtors' assets pursuant to the Bid Procedures;

(j)   No later than on the first Business Day on or after fifty (50) days after the Petition Date, obtain entry of an order of the Bankruptcy Court, in form and substance acceptable to the DIP Lender, in its sole discretion, approving the Sale; and

No later than on the first Business Day on or after sixty-five (65) days after the Petition Date, close the Sale of substantially all of the Debtors'' assets pursuant to the Bid Procedures and either (x) convey the purchased assets to PGV pursuant to its stalking horse purchase agreement or (y) indefeasibly and finally pay the DIP Facility obligations, any Prepetition First Priority Obligations, and all other obligations to the DIP Lender, whether arising prior to, on, or after the Petition Date, in full, in cash, at the closing of the Sale.

<u>Performance Covenant</u>:   Borrower shall: (a) commencing on the first Wednesday to occur after the second Friday after the Petition Date and on the third Business Day of each week thereafter, generate net

cash collections in an amount equal to at least 95% of the amount set forth in the Budget for the cumulative period commencing on the Petition Date and ending on such testing date; and (b) commencing on the first Wednesday to occur after the second Friday after the Petition Date and on the third Business Day of each week thereafter, maintain aggregate disbursements no greater than 105% more than the aggregate amount projected by the Budget to be expended during the cumulative period commencing on the Filing Date and ending on such testing date.

|  |  |
|---|---|
| Events of Default: | Any one or more of the following events shall constitute an Event of Default under the DIP Facility: (a) if the Debtors fail to pay when due and payable, or when declared due and payable, all or any portion of the obligations consisting of principal, interest, fees, or charges due to the DIP Lender under the DIP Facility, reimbursement of the DIP Lender's expenses, or other amounts (other than any portion thereof constituting principal) constituting obligations under the DIP Facility (including any portion thereof that accrues after the commencement of an insolvency proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such insolvency proceeding); (b) if the Debtors: (i) fail to comply with any of the Chapter 11 Milestones; (ii) fail to comply with the Performance Covenants; (iii) fail to perform or observe any covenant or other agreement contained in Postpetition Loan Agreement or DIP Credit Agreement (as applicable), the Interim Order or the Final Order; (iv) breach or fail to comply with any provision of the Interim Order or Final Order entered by the Bankruptcy Court; and (c) such other defaults as are usual or customary. |
| Representations and Warranties: | The DIP Credit Agreement contains representations and warranties customarily found in loan agreements for similar debtor in possession financings, including, without limitation, with respect to organization in good standing, validity of agreements, tax status, and compliance with laws. |
| Expenses: | The Debtors shall pay all reasonable costs and expenses, incurred by the DIP Lender (including the reasonable fees and expenses of counsel, accountants and other professionals and advisors), as well as all reasonable expenses of the DIP Lender in connection with the negotiation, administration, monitoring and enforcement of the loan documentation. |

<table>
<tr><td>Indemnification:</td><td>The Debtors shall indemnify the DIP Lender and certain related persons in accordance with Section 10.3 of the Postpetition Loan Agreement.</td></tr>
</table>

### Highlighted Provisions Under Local Rule 4001-2(a)(i)

32.     Local Rule 4001-2(a)(i) requires the Debtors to highlight certain provisions included in the Postpetition Loan Agreement and the Interim Order.  As discussed herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these cases and should be approved.  The provisions under Local Rule 4001-2(a)(i) included in the Postpetition Loan Agreement and Interim Order are as follows:

(a)     Local Rule 4001-2(a)(i)(A) requires the disclosure of provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to prepetition secured creditors.  Neither the Postpetition Loan Agreement nor the Interim Order contains any such provision.

(b)     Local Rule 4001-2(a)(i)(B) requires the disclosure of provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition liens or the waiver of claims against the secured creditor without first giving parties in interest an opportunity to conduct an investigation.  Although the Postpetition Loan Agreement and Interim Order contain stipulations by the Debtors with respect to, among other things, the validity, perfection, and amount of liens held by the Prepetition First Priority Lender, the Interim Order provides that such stipulations and findings are subject to the right of any parties in interest, any Trustee or any Committee to timely to file an adversary proceeding challenging such stipulations and findings (a) for the Trustee or any party in interest, on the earlier of (i) 75 days after the entry of the Interim Order and (ii) fourteen (14) days before any hearing to approve the Sale, or (b) for the Committee, on the earlier of (i) 60 days after appointment of the Committee and (ii) fourteen (14) days before any hearing to approve the Sale.   (Interim Order at ¶¶ C and 9(a)).

(c)     Local Rule 4001-2(a)(i)(C) requires the disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code.  It is contemplated that the Final Order will provide for a waiver of rights under section 506(c) of the Bankruptcy Code with respect to the Collateral.  (Interim Order at ¶ 7(b)).

(d)     Local Rule 4001-2(a)(i)(D) requires the disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548, and 549 of the Bankruptcy Code.  The Postpetition Loan Agreement and the Interim Order

provide for the granting of liens in favor of the DIP Lender Parties on the Debtors' claims and causes of action arising under sections 544, 545, 547 through 551, and 553(b) of the Bankruptcy Code; however, the grant of such liens is subject to the entry of the Final Order. (Definition of "Collateral" in Postpetition Loan Agreement and Interim Order).

(e)     Local Rule 4001-2(a)(i)(E) requires the disclosure of provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(a) of the Bankruptcy Code. Under the Postpetition Loan Agreement and Interim Order, following entry of a Final Order, the Debtors will use part of the DIP Facility to repay the Prepetition First Priority Obligations. (Postpetition Loan Agreement at § 6.13; Interim Order at ¶ 1(c)). The repayment of the Prepetition First Priority Obligations remains subject to the effects of a timely challenge by any party in interest to the validity, enforceability, priority, or extent of such prepetition secured obligations or the prepetition liens (Interim Order at ¶ 1(c)).

(f)     Local Rule 4001-2(a)(i)(F) requires the disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carveout. The Budget provides for separate line items for Debtors' and Committee's professionals, but otherwise neither the Postpetition Loan Agreement nor the Interim Order provide any such disparate treatment.

(g)     Local Rule 4001-2(a)(i)(G) requires the disclosure of provisions that prime any secured lien without the consent of that lienor. Neither the Postpetition Loan Agreement nor the Interim Order provide for the priming of any secured lien without the consent of the lienor.

(h)     Local Rule 4001-2(a)(i)(H) requires the disclosure of provisions that seek to affect the Court's power to consider the equities of the cases under 11 U.S.C. § 552(b)(1). No such relief is sought in connection with the Interim Order.

## BASIS FOR RELIEF

**A.     THE REQUESTED RELIEF SHOULD BE GRANTED PURSUANT TO SECTIONS 364(c) AND 364(d)(1) OF THE BANKRUPTCY CODE.**

33.     As set forth above, the Debtors' ability to maximize the value of their estates and successfully sell their business operations hinges upon their being able to access postpetition financing. Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary

course of business, and (c) obtaining credit with specialized priority or on a secured basis.
Pursuant to section 364(c) of the Bankruptcy Code, if a debtor cannot obtain postpetition credit
on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is
entitled to super-priority administrative expense status, secured by a senior lien on
unencumbered property or secured by a junior lien on encumbered property. *See* 11
U.S.C. § 364(c).

34.     Under section 364 of the Bankruptcy Code, courts also may authorize postpetition
credit secured by a senior or equal lien on encumbered property if the debtor cannot obtain credit
elsewhere and the interests of existing lienholders are adequately protected. *See* 11 U.S.C.
§ 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides, in relevant part,
that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or
> equal lien on property of the estate that is subject to a lien only if—
>
> (A)     the [debtor] is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the
> property of the estate on which such senior or equal lien is proposed to be
> granted.

11 U.S.C. § 364(d)(1).

**I.      The Debtors Have Exercised Their Business Judgment in Entering Into the
DIP Facility.**

35.     A debtor's decision to enter into a postpetition lending facility under section 364
of the Bankruptcy Code is governed by the business judgment standard. *See In re Ames Dep't
Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's
discretion under section 364 is to be utilized on grounds that permit reasonable business
judgment to be exercised so long as the financing agreement does not contain terms that leverage
the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to

benefit parties in interest."); *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors.").

36.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See*, *e.g.*, *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court").  Further, one court has noted that "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

37.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  *See In re Curlew Valley Assocs.*, 14 B.R. 506, 511–13 (Bankr. D. Utah 1981); *see also In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor).  Bankruptcy courts generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley*, 14 B.R. at 513–14.

38.    The Debtors have exercised sound business judgment in determining the appropriateness of the DIP Facility and have satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the Postpetition Loan Agreement.  The use of Cash Collateral alone is insufficient to meet the Debtors' working capital needs to operate their businesses in the ordinary course.  The Postpetition Loan Agreement contains terms and conditions that are the best available under the circumstances and provides the Debtors with sufficient liquidity during the period of the Budget.  In addition, the Debtors' repayment of the Prepetition First Priority Obligations, subject to entry of a Final Order and as set forth in the Postpetition Loan Agreement, is reasonable and appropriate under the circumstances.  The Postpetition Lender would not have agreed to extend postpetition financing without a roll-up or repayment of the Debtors' obligations in connection with the Prepetition First Priority Credit Agreement.  In addition, the Interim Order preserves the rights of other parties in interest, including any statutory committee of unsecured creditors, to investigate and challenge the validity, enforceability, perfection, and priority of the Prepetition First Priority Obligations and the liens and security interests granted in connection therewith.  This Court has previously approved similar debtor-in-possession financing agreements where the debtor was not able to obtain postpetition financing under other conditions.[6]  *See, e.g.*, *In re Imris, Inc., et al.*, Case No. 15-11133 (Bankr. D. Del. May 25, 2015); *In re Cal Dive Int'l, Inc., et al.*, Case No. 15-10458 (Bankr. D. Del. April 20, 2015); *In re Digital Domain Media Group, Inc., et al.*, Case No. 12-12568 (BLS) (Bankr. D. Del. Nov. 7, 2012); *In re Real Mex Restaurants, Inc. et al.*, Case No.

---

[6]    The referenced orders are voluminous in nature and are not attached to this Motion; however, in light of the requirements of Local Rule 7007-2(a)(vii), undersigned counsel will make copies of each order available to the Court or to any party that requests them.

11-13122 (BLS) (Bankr. D. Del. Nov. 9, 2011); *In re Landsource Communities Development LLC, et al.*, Case No. 08-11111 (KJC) (Bankr. D. Del. July 21, 2008)

39.     The funds provided by the DIP Facility are essential to enable the Debtors to continue to operate during the course of these chapter 11 cases while working towards a sale transaction that is in the best interest of the estates.  Indeed, failure to obtain approval of the DIP Facility will lead to a wind-down of the Debtors' business operations which, in turn, will preclude any sale of the Debtors' assets and adversely affect the value ultimately received by stakeholders.

40.     Accordingly, pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors respectfully submit that they should be granted authority to obtain financing from the Postpetition Lender on the terms set forth in the Postpetition Loan Agreement.

## II.     The DIP Facility Represents the Best Financing Available.

41.     A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source.  *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

42.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an

exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

43.     The Debtors and their advisors conducted an extensive marketing process pre-petition to solicit both financing (whether outside or in the context of a chapter 11 case) and sale/restructuring proposals.  The Debtors have determined that the terms and conditions of the DIP Facility are the best available under the circumstances and address the Debtors' working capital needs, and no other entity was willing to provide financing on any better terms. Postpetition financing is not otherwise available without granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, and securing such indebtedness and obligations with the security interests in and the liens upon the DIP Collateral pursuant to section 364(c) and (d) of the Bankruptcy Code (in each case subject to the Carveout and Permitted Liens).  The Debtors are unable to obtain the necessary postpetition financing that they need on terms more favorable than those provided by the DIP Facility.  Accordingly, the Debtors' efforts to obtain postpetition financing satisfy the statutory requirements of section 364(c) of the Bankruptcy Code.

III.    **The DIP Facility Is Necessary to Maintain the Debtors' Ongoing Business Operations and to Successfully Consummate a Sale of the Debtors' Assets in These Cases.**

44.    The DIP Facility, if approved, will provide essential working capital, allowing the Debtors to maintain the value of their assets and their ongoing business operations while working towards a sale of the Debtors' assets in these chapter 11 cases.  In addition, the DIP Facility will provide the Debtors' various constituencies, including customers, employees, vendors, and service providers, with confidence in the Debtors' ability to maintain operations while working towards a sale transaction.

45.    If the relief sought in this Motion is denied or delayed, the Debtors likely will experience business disruptions, the Debtors' ability to properly service customers will be hindered, and the Debtors' ability to consummate a sale transaction and maximize value for the estates may be irreparably damaged.  Accordingly, the DIP Facility is necessary to maximize value for the Debtors' estates and inures to the benefit of creditors and all parties in interest.

IV.    **The Terms of the DIP Facility Are Fair, Reasonable, and Adequate Under the Circumstances.**

46.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).  The appropriateness of a proposed financing facility should also be considered in light of current market conditions.  *See Transcript of Record* at 740:4–6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of

present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions reasonable here and now.").

47.    The terms and conditions of the DIP Facility were negotiated in good faith and at arm's length among the parties, culminating in the Postpetition Loan Agreement that is designed to provide the Debtors with essential working capital and maintain the Debtors' ongoing business operations while working towards a sale of the Debtors' assets.  Indeed, when viewed in its totality, the DIP Facility reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and is supported by fair consideration.

**V.    Section 364(e) Protections Should Apply to the DIP Facility.**

48.    The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arm's length. Accordingly, the Court should find that the Postpetition Lender is a "good faith" lender within the meaning of Bankruptcy Code section 364(e), and is entitled to all of the protections afforded by that section.

**B.    THE DEBTORS' REQUEST FOR USE OF CASH COLLATERAL
         AND THE PROPOSED ADEQUATE PROTECTION IS APPROPRIATE.**

49.    The Debtors' use of property of the estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . .
> . of this title and unless the court orders otherwise, the [debtor] may enter into
> transactions, including the sale or lease of property of the estate, in the ordinary
> course of business, without notice or a hearing, and may use property of the estate
> in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

50.    Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize the Debtors to use cash collateral as long as the applicable secured creditors consent or are

adequately protected. *See In re McCormick*, 354 B.R. 246, 251 (Bankr. C D. Ill. 2006) (to use the cash collateral of a secured creditor, the debtor must have the consent of the secured creditor or must establish to the Court that the secured creditor's interest in the cash collateral is adequately protected). "Cash Collateral" is defined as, "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a).

51.     The Debtors have an urgent need for the immediate use of the Cash Collateral pending the final hearing on this Motion and seek to use Cash Collateral existing on or after the Petition Date in accordance with the Interim Order and Postpetition Loan Agreement. The Debtors require the use of the Cash Collateral to, among other things, maintain their ongoing business operations and to pay the costs and expenses associated with the administration of these chapter 11 cases by providing for periodic payments under its revolving loan facility. Absent the use of Cash Collateral, the Debtors' ability to perform under their various contracts and agreements would be diminished and the value of the Debtors' business as a going concern would be irreparably impaired.

52.     In addition, the Prepetition First Priority Lender is the only party holding a security interest in the Cash Collateral and has consented to the use of Cash Collateral as requested herein, subject to their receipt of the adequate protection provided for in the Interim Order. Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985). The focus of the requirement is to protect a secured creditor from the diminution in value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev.*

*Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

53.     Courts have also held that adequate protection may be demonstrated by showing that the secured creditor's interest in the collateral is preserved by the debtor's use of the cash collateral in a manner that maintains or enhances the collateral's value.  *See In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a secured creditor was adequately protected when cash collateral was used to pay necessary operating expenses); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105–06 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral and existing equity cushion); *accord in re Atrium Dev. Co.*, 159 B.R. 464, 471 (Bankr. E.D. Va. 1993) ("Adequate protection is typically established by the fact that cash is being used to maintain and enhance the value of the underlying income producing real property in which the creditor also usually holds a security interest."); *McCombs Props. VI, Ltd. V. First Tex. Sav. Ass'n (In re McCombs Props. VI, Ltd.)*, 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) (holding that committing to use cash collateral for operating expenses substantially eliminated the risk of diminution in the secured creditor's interest in the collateral).

54.     The proposed adequate protection is typical and appropriate under the circumstances.  Specifically, as adequate protection for the Prepetition First Priority Lender with respect to, and solely to the extent of, any diminution of value in the prepetition collateral from and after the Petition Date, the Prepetition First Priority Lender shall receive (a) replacement liens in the Debtors' real and personal property, subject to the postpetition liens in favor of the Postpetition Lender, Permitted Liens, and the Carveout, and (b) an allowed claims under section

507(b) of the Bankruptcy Code, subject to the Carveout but with priority over all other costs and expenses of administering the chapter 11 cases that are incurred under any provision of the Bankruptcy Code, including, without limitation, sections 503(b), 506(c), 507(a), or 552(b), and the claims of any other party in interest under section 507(b).

55.    The Prepetition First Priority Lender has consented to these forms of adequate protection.  Accordingly, the Debtors should be authorized to use Cash Collateral as set forth herein.

## C.    MODIFICATION OF THE AUTOMATIC STAY ON A LIMITED BASIS IS WARRANTED.

56.    The relief requested herein contemplates a modification of the automatic stay pursuant to Bankruptcy Code section 362 to the extent necessary to permit the Postpetition Lender to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the Postpetition Loan Agreement, the Postpetition Documents, the Interim Order, and the Final Order, after three (3) business days' notice thereof, and to take various actions without further order of or application to the Court.

57.    Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated by the Postpetition Loan Agreement and Postpetition Documents and the proposed DIP Orders.

## D.    INTERIM APPROVAL AND SCHEDULING OF FINAL HEARING.

58.    As set forth above, Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code or to obtain credit under section 364 of the Bankruptcy Code may not be commenced earlier than fourteen

(14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

59.    Absent relief on an interim basis pursuant to the Interim Order, the Debtors will be unable to satisfy their immediate and projected payment obligations, including payroll and other operating expenses.  Given the immediate and irreparable harm to be suffered by the Debtors absent interim relief, the Debtors respectfully request that the Court schedule and conduct a preliminary hearing on the Motion and (a) authorize the Debtors, from the entry of the Interim Order until the Final Hearing, to obtain credit under the terms contained in the Postpetition Loan Agreement and to utilize Cash Collateral, and (b) schedule the Final Hearing.

**E.**    **WAIVER OF BANKRUPTCY RULES 6004(a) AND (h).**

60.    The Debtors believe an efficient and expeditious approval and implementation of the DIP Facility is in the best interests of their creditors and other parties in interest, including patients.  Accordingly, the Debtors seek waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of orders authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

<u>NOTICE</u>

61.    No trustee, examiner, or statutory committee of unsecured creditors has been appointed in these chapter 11 cases.  Notice of this Motion will be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' twenty largest unsecured creditors on a consolidated basis; (c) counsel to PGV Solutions Midwest, LLC, as Postpetition Lender and Prepetition First Priority Lender; (d) counsel to Fifth Third Bank; (e) the

United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) all applicable taxing authorities; and (h) any and all known parties that may be asserting a lien against the DIP Collateral (collectively, the "Notice Parties").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice is necessary or required.

### NO PRIOR REQUEST

62.    No prior request for the relief sought herein has been made to this or any other court.

[*Text Continues on the Next Page*]

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court (i) enter an order substantially in the form of the proposed Interim Order attached hereto as Exhibit A, (ii) after the Final Hearing, enter the Final Order substantially in the form that shall be filed with the Court, and (iii) grant such other and further relief as this Court deems just and proper.

Dated: March 13, 2016  
       Wilmington, Delaware

**DLA PIPER LLP (US)**

/s/ Stuart M. Brown  
Stuart M. Brown (DE 4050)  
Kaitlin M. Edelman (DE 5924)  
1201 N. Market Street, Suite 2100  
Wilmington, DE 19801  
Telephone: (302) 468-5700  
Facsimile: (302) 394-2341  
Email:    Stuart.Brown@dlapiper.com  
            kaitlin.edelman@dlapiper.com

-and-

Thomas R. Califano (*pro hac vice* admission pending)  
Daniel G. Egan (*pro hac vice* admission pending)  
1251 Avenue of the Americas  
New York, New York 10020  
Telephone: (212) 335-4500  
Facsimile: (212) 335-4501  
Email: Thomas.Califano@dlapiper.com  
       Daniel.Egan@dlapiper.com

*Proposed Attorneys for the Debtors and Debtors in Possession*